No. 23-2298

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————

DR. KENNETH TAYLOR,
*Plaintiff-Appellant*,

v.

XAVIER BECERRA,
*Defendant-Appellee*,

———————

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

The Honorable Peter J. Messitte

———————

## BRIEF OF APPELLEE XAVIER BECERRA

———————

EREK L. BARRON
United States Attorney

Molissa H. Farber
Assistant United States Attorney
U.S. Attorney's Office, District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4862

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................... i

TABLE OF AUTHORITIES ............................................................. iv

I.      INTRODUCTORY STATEMENT .............................................1

II.     STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ................2

III.    STATEMENT OF THE CASE....................................................3

     A.   Dr. Taylor treated his coworkers disrespectfully for years, resulting in a memorandum of counseling. ............................................3

     B.   Dr. Taylor's 2017 performance review was similar to previous years' reviews and reflected his supervisory shortcomings............................5

     C.   Dr. Taylor expressed interest in transferring to another position, so management worked with him to find an alternative role, which he declined. ...............................................................7

     D.   Dr. Taylor applied for an open senior-level leadership position at NIH, competing against an incumbent who had been serving in that position for almost seven years. A selection committee consisting of five voting members chose to keep the incumbent in the role. ...............................7

     E.   The district court granted summary judgment in favor of Becerra.....10

IV.     STANDARD OF REVIEW .......................................................12

V.      SUMMARY OF ARGUMENT ..................................................13

VI.     ARGUMENT .....................................................................15

     A.   "Grinch" is not a protected class. .......................................15

     B.   The district court properly granted summary judgement as to Dr. Taylor's non-selection claims because he cannot show circumstances giving rise to an inference of discrimination or pretext. .....................18

1.     Dr. Taylor's non-selection for TRSP Director does not give rise to an inference of discrimination or retaliation because the selection panel unanimously agreed Dr. Taylor was less qualified than the selectee. ....................................................................19

2.     Dr. Taylor cannot establish that the reasons justifying his non-selection were pretext as a matter of law because he concedes that Dr. Meissner was qualified and has no evidence that he was significantly better qualified. ....................................................24

3.     The "disputed" facts surrounding Dr. Holman's alleged retaliatory interference with Dr. Taylor's application for TRSP Director are neither genuine nor material. ...............................30

    a.     The Fourth Circuit has not held that Title VII allows interference claims against the federal government. ......30

    b.     Dr. Holman did not have the power to make a tangible employment decision as a matter of law. ......................32

    c.     Dr. Taylor's speculative belief that Dr. Holman swung the interview panel against him is not genuine. ..................34

C.     Dr. Taylor's retaliatory hostile work environment claim consists of innocent or trifling annoyances that, even collectively, are neither severe nor pervasive. ........................................................................38

1.     Dr. Taylor's objectively unreasonable perception of his workplace is not a sufficient basis to defeat summary judgment. ................................................................................40

2.     Even if Dr. Taylor could establish severity or pervasiveness, he cannot show a connection to protected activity. .......................44

    a.     Generally applicable workplace policies cannot form the basis of a hostile work environment complaint.............44

    b.     Dr. Taylor cannot dispute FDA's nondiscriminatory and nonretaliatory reasons for its actions.............................47

3.   Dr. Taylor's remaining allegations are petty tribulations of an ordinary workplace. ..................................................................51

VII.   CONCLUSION ...............................................................................53

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................... 13

*Anderson v. Westinghouse Savannah River Co.*,
    406 F.3d 248 (4th Cir. 2005) ........................................... 20, 21, 23

*Autry v. N. Carolina Dep't of Hum. Res.*,
    820 F.2d 1384 (4th Cir. 1987) ...................................................... 35

*Bekkem v. Wilkie*,
    915 F.3d 1258 (10th Cir. 2019) ............................................. 21, 22

*Bender v. Hecht's Dep't Stores*,
    455 F.3d 612 (6th Cir. 2006) ................................................. 26, 29

*Bender v. Suburban Hosp.*,
    159 F.3d 186 (4th Cir. 1998) ........................................................ 31

*Burlington Indus., Inc. v. Ellerth*,
    524 U.S. 742 (1998) ..................................................................... 33

*Burlington N. and Santa Fe Ry. Co. v. White*,
    548 U.S. 53 (2006) ................................................................. 41, 43

*Carr v. N.Y. City Trans. Auth.*,
    76 F.4th 172 (2d Cir. 2023) ................................................... 44, 45

*Causey v. Balog*,
    162 F.3d 795 (4th Cir. 1998) ................................................. 38, 44

*Chang Lim v. Azar*,
    310 F. Supp. 3d 588 (D. Md. 2018) .............................................. 33

*Daniels v. Essex Grp., Inc.*,
    937 F.2d 1264 (7th Cir. 1991) ...................................................... 41

*Darvishian v. Geren*,
   404 F. App'x 822 (4th Cir. 2010) .......................................................... 18, 26

*Dash v. Mayweather*,
   731 F.3d 303 (4th Cir. 2013) ................................................................ 34, 35

*Devonish v. Napolitano*,
   No. 13-0108, 2014 WL 465707 (D. Md. Feb. 4, 2014) .................................20

*Drewitt v. Pratt*,
   999 F.2d 774 (4th Cir. 1993) ..............................................................................13

*Duplessis v. Training & Dev. Corp.*,
   835 F. Supp. 671 (D. Me. 1993) .......................................................................42

*E.E.O.C. v. Int'l Profit Assocs., Inc.*,
   No. 01-C-4427, 2007 WL 3120069 (N.D. Ill. Oct. 23, 2007).......................42

*E.E.O.C. v. Western Elec. Co., Inc.*,
   713 F.2d 1011 (4th Cir. 1983) ...........................................................................25

*E.E.O.C. v. Clay Printing Co.*,
   955 F.2d 936 (4th Cir. 1992) .............................................................................21

*E.E.O.C. v. Sunbelt Rentals, Inc.*,
   521 F.3d 306 (4th Cir. 2008) ............................................................... 39, 40

*Eghbali v. Dept. of Energy at Savannah River Nat. Lab.*,
   90 F. Supp. 3d 587 (D.S.C. 2015) ....................................................... 30, 32

*Evans v. Int'l Paper Co.*,
   936 F.3d 183 (4th Cir. 2019) .............................................................................13

*Evans v. Techs. Applications & Serv. Co.*,
   80 F.3d 954 (4th Cir. 1996) ................................................. 12, 20, 25, 28

*Fabunmi v. Univ. of Md. at Coll. Park*,
   172 F.3d 862 (4th Cir. 1999) .............................................................................35

*Faragher v. City of Boca Raton,*
　　524 U.S. 775 (1998)...................................................................38

*Galloway v. Gen. Motors Serv. Parts Operations*,
　　78 F.3d 1164 (7th Cir. 1996) ......................................................37

*Giarola v. Com. Of Va. Dep't of Gen. Servs.,*
　　753 F.2d 1281 (4th Cir. 1985) .....................................................25

*Gulino v. N.Y. State Educ. Dept.,*
　　460 F.3d 361 (2d Cir. 2006) .........................................................31

*Ham v. Wash. Suburban Sanitary Com'n*,
　　158 Fed. App'x 457 (4th Cir. 2005) ................................. 26, 27, 36

*Harris v. Forklift Sys., Inc.,*
　　510 U.S. 17 (1993)......................................................... 40, 41, 52

*Hawkins v. PepsiCo, Inc.,*
　　203 F.3d 274 (4th Cir. 2000) ............................................... 16, 51

*Heiko v. Columbo Sav. Bank,*
　　434 F.3d 249 (4th Cir. 2006) .......................................................25

*Hill v. Lockheed Martin Logistics Mgmt., Inc., .*
　　354 F.3d 277 (4th Cir. 2004) .......................................................33

*Israelitt v. Enter. Servs. LLC,*
　　778 F.4th 647 (4th Cir. 2023) ......................................................51

*Laurent-Workman v. Wormuth,*
　　54 F.4th 201 (4th Cir. 2022) ................................. 27, 43, 44, 51, 52

*Lopez v. Massachusetts,*
　　588 F.3d 69 (1st Cir. 2009)..........................................................31

*McCollum v. Bolger,*
　　794 F.2d 602 (11th Cir. 1986) .....................................................17

*Mod-U-Kraf Homes,*
    775 F.3d 202 (4th Cir. 2014) ........................................................19

*Moore v. Reese,*
    817 F. Supp. 1290 (D. Md. 1993)................................................34

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002)....................................................................37

*Nhira v. Bowie State Univ.,*
    No. 14-cv-676, 2014 WL 6065998 (D. Md. Nov. 12, 2014) .......31

*Ofoche v. Apogee Med. Grp., Va., P.C.,*
    815 Fed. App'x 690 (4th Cir. 2020) ...........................................51

*Ogunwole v. Raimondo,*
    616 F. Supp. 3d 478 (D. Md. 2022)....................................... 20, 23

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998).................................................................. 40, 42

*Peters v. Renaissance Hotel Operating Co.,*
    307 F.3d 535 (7th Cir. 2002) ......................................................17

*Petro-Ryder v. Capt. Jacqueline Pittman,*
    No. CV 15-2908, 2015 WL 8731623 (E.D. Pa. Dec. 11, 2015) ...................41

*Racklin v. Zeta Glob. Corp.,*
    No. 22-2077, 2023 WL 5165281 (4th Cir. Aug. 11, 2023)..........51

*Rodriguez v. Kantor,*
    162 F.3d 1155 (4th Cir. 1998) ....................................................52

*Skvarla v. Potter,*
    109 F. App'x 799 (7th Cir. 2004)................................................16

*Stephens v. Gutierrez,*
    No. 8-cv-870, 2010 WL 1005189 (E.D. Va. Mar. 15, 2010) .......25

*Sullivan v. Sch. Bd. of Pinellas Cnty.*,
    773 F.2d 1182 (11th Cir. 1985) ..................................................17

*Tex. Dep't of Cmty. Affs. v. Burdine*
    450 U.S. 248 (1981)............................................................... 20, 21

*Thorn v. Sebelius*,
    766 F. Supp. 2d 585 (D. Md. 2011)..........................................47

*Vance v. Ball State Univ.*,
    570 U.S. 421 (2013)..................................................................33

*Verniero v. Air Force Acad. Sch. Dist. No. 20*,
    705 F.2d 388 (10th Cir. 1983) ..................................................36

*Walton v. Harker*,
    33 F.4th 165 (4th Cir. 2022) .....................................................44

*Webster v. Chesterfield Cnty. Sch. Bd.*,
    38 F.4th 404 (4th Cir. 2022) .....................................................40

*White v. Seventh Jud. Cir. of Md.*
    846 F.2d 75 (4th Cir. 1988) ................................................ 20, 23

*Williams v. Cerberonics*,
    871 F.2d 452 (4th Cir. 1989) ....................................................16

*Williams v. Giant Food Inc.*,
    370 F.3d 423 (4th Cir. 2004) ....................................................18

## Statutes

42 U.S.C. § 2000e ............................................................................32

## Rules

Fed. R. Civ. P. 56 ............................................................................13

## I.    <u>INTRODUCTORY STATEMENT</u>

"Grinch" is not a protected class. Neither Title VII nor the Age Discrimination in Employment Act (ADEA) protect an individual from not being well-liked in the workplace. They do not protect a person from the everyday indignities and annoyances of working in an office. Nor do they entitle a person to a job opportunity if the person is not the most qualified candidate by far.

Appellant Dr. Kenneth Taylor fervently attributed every workplace slight, disappointment, and annoyance to his age, gender, or retaliation for previous protected activity. Dr. Taylor's hostile work environment allegations are as trivial as receiving 1.75 hours of "compensatory time for travel" instead of regular "compensatory time," or the fact that a coworker appeared to laugh while speaking to him. The only thing connecting any of Dr. Taylor's allegedly hostile experiences to protected class are his own assumptions.

His non-selection claims suffer from similar flaws. When Dr. Taylor competed for a job against an incumbent – a person who had successfully served in the same role for seven years – he attributed his non-selection to discrimination and retaliation instead of his relative lack of qualifications and poor interview performance. Dr. Taylor tries to spin a retaliatory motive out of a single remark by former supervisor who had no power over the ultimate non-selection decision, referring to Dr. Taylor as "the Grinch." But Dr. Taylor ignores the fact that Dr.

Holman made this remark the week before Christmas, while Dr. Taylor walked into his own office that was fully adorned with Grinch-themed decorations.

Because his case is the textbook example of an employment case that should not survive summary judgment, this Court should affirm the district court.

## II.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Dr. Taylor competed for a promotion against an incumbent who successfully held the same position for more than six years.  A search committee of eight people administered the same interview questions to all qualified candidates. All five voting members of the committee ranked Dr. Taylor the lowest of three interviewees and ranked the incumbent the highest.  Where Dr. Taylor does not argue the incumbent selectee was unqualified for the position but argues only his personal belief that he was somewhat more qualified, did the district court correctly find that these circumstances did not give rise to an inference of discrimination or retaliation?

2.    To prove his retaliatory hostile work environment claim, Dr. Taylor must show that allegedly harassing events were severe or pervasive – beyond the ken of ordinary workplace tribulations – and connected to his previous protected activity.  Where Dr. Taylor instead presents a list of normal workplace tribulations unconnected to retaliation, can he show retaliatory hostile work environment as a matter of law?

III.  **STATEMENT OF THE CASE**

A.  **DR. TAYLOR TREATED HIS COWORKERS DISRESPECTFULLY FOR YEARS, RESULTING IN A MEMORANDUM OF COUNSELING.**

Dr. Taylor took a supervisory role at the Food and Drug Administration (FDA) in approximately 2014, as a supervisory chemist with the Center for Tobacco Products (CTP) within the Office of Science (OS).  JA 30 (at ¶ 28), JA 130.  In the years since then, Dr. Taylor's supervisors consistently admonished him about needing to "be[] a team player, working more collaboratively with the staff, and developing better relationships with the team leaders" he supervised.  JA 154.  Dr. Taylor's 2015 and 2016 Performance Management Appraisal Program (PMAP) reports mentioned the issues with his staff and the "less-than-ideal relationship between [Dr.] Taylor and his team leader."  JA 179.

Dr. Matthew Walters took over as Dr. Taylor's supervisor sometime after July of 2017.  JA 152, 178.  Dr. Walters noticed that Dr. Taylor's inappropriate behavior "ha[d] not changed from year to year" despite mentoring efforts to "help[] [Dr. Taylor] develop as a supervisor."  JA 154.  In one instance, Dr. Walters personally witnessed a meeting between Dr. Taylor and one of his team leaders.  JA 155.  Dr. Walters saw Dr. Taylor get "very hot under the collar and beg[i]n berating his team leader."  JA 155.  The situation quickly escalated and Dr. Walters "had to intervene to redirect the intensity of the conversation."  JA 155.

Other supervisors higher up in the supervisory chain observed similar issues. Dr. Matthew Holman had been Dr. Taylor's immediate supervisor before Dr. Walters, then moved "several levels up" in Dr. Taylor's supervisory chain. JA 178. Dr. Holman commented that "morale of [Dr.] Taylor's staff was low" because of Dr. Taylor's management style. JA 179. Dr. Taylor's second-line supervisor, Dr. Colleen Rogers, saw the same issues. JA 172. Dr. Rogers fielded complaints about Dr. Taylor's difficult personality from Dr. Taylor's staff members, one of whom expressed a fear that Dr. Taylor would retaliate against them for complaining. JA 174. Dr. Taylor's personality problems even followed him when he took a detail to FDA's Center for Food Safety and Applied Nutrition (CFSAN) in late 2017. JA 181 (describing detail). While working at CFSAN, Dr. Taylor's supervisor on detail told Dr. Walters that Dr. Taylor still "had a challenge working with others." JA 154–55. Dr. Taylor's treatment of his team was so problematic that three of his employees "left the Division or [were] reassigned due to feeling harassed by [Dr.] Taylor." JA 159. One of Dr. Taylor's employees even filed an EEO complaint against Dr. Taylor for harassment. JA 160.

In or around June 2018, Dr. Walters received a spate of complaints about Dr. Taylor's behavior in a short period of time. JA 166–67, 223. To address this continuing problem, Dr. Walters issued a memorandum of counseling documenting and addressing Dr. Taylor's behavior. JA 223. The memorandum highlighted four

incidents when Dr. Taylor demonstrated inappropriate, unprofessional, or uncivil behavior.  JA 223.  Dr. Taylor did not deny that any of these incidents occurred.  JA 133–34.  His only response to one incident was that the complaining individual was "supervised by Mr. Walters' wife."  JA 133.  He complained that a "problematic employee" who "forged an alliance" with Dr. Walters reported two of the incidents.  JA 133, 140.  For the remaining two incidents Dr. Taylor did not dispute the substance of his inappropriate or condescending remarks but merely disagreed he was inappropriate or condescending.  JA 133–34.  Dr. Taylor did not identify any subordinates who could provide an affidavit in support of his management style.  *See, e.g.*, JA 134.

## B.    DR. TAYLOR'S 2017 PERFORMANCE REVIEW WAS SIMILAR TO PREVIOUS YEARS' REVIEWS AND REFLECTED HIS SUPERVISORY SHORTCOMINGS.

Dr. Taylor left CTP in October 2017 to go on a detail with CFSAN.  JA 180.  Dr. Taylor went on this detail "with the expectation that the detail may turn into a permanent position."  JA 181.  Nobody in Dr. Taylor's supervisory chain knew whether he would ever come back to CTP.  JA 181.  While on detail, Dr. Taylor was expected "to focus on his detail at CFSAN . . . and not any activities related to his former staff members and the activities at CTP."  JA 158.

Dr. Walters completed Dr. Taylor's 2017 performance appraisal.  JA 154–58.  He gave Dr. Taylor a slightly lower overall on his 2017 PMAP than he did on his

2016 PMAP, reducing his 4.5 rating to a 4.33 rating.  JA 155, JA 180.  This 4.33 rating was still in line with Dr. Taylor's previous PMAPs.  JA 180 (noting Dr. Taylor's 2012 to 2016 PMAP scores ranged from 3.83 to 4.5, with an average score of 4.266).  He received perfect scores on scientific and technical criteria.  JA 155. He lost points on "internal/external communications," "work management," and supervision.  JA 155.  The areas in which Dr. Taylor lost points relate to his "managerial skills."  JA 155, 156.  The review said that Dr. Taylor should improve his working relationship with his team leads.  JA 125.  Dr. Taylor acknowledged, "[a]s a supervisor, I have to work effectively with others."  JA 125.

Because Dr. Taylor was away on detail in February of 2017 when his PMAP was ready, Dr. Walters planned to conduct Dr. Taylor's performance appraisal by phone.  JA 152.  Although Dr. Walters set a meeting to discuss the PMAP with Dr. Taylor, Dr. Taylor sent several "verbose" emails disagreeing with the PMAP and then Dr. Taylor unilaterally cancelled the meeting.  JA 152–53.  Drs. Taylor and Walters exchanged emails on February 13, 2018 about the PMAP in which Dr. Taylor asked a number of questions.  JA 198–99.  When Dr. Walters did not directly answer one of the questions, Dr. Taylor interpreted Dr. Walters' email as "intimidating and evasive."  JA 89, JA 198–99.  On February 14, 2018, Dr. Taylor made initial contact with the EEO to complain about his PMAP and Dr. Walters' email.  JA 84.

**C.    DR. TAYLOR EXPRESSED INTEREST IN TRANSFERRING TO ANOTHER POSITION, SO MANAGEMENT WORKED WITH HIM TO FIND AN ALTERNATIVE ROLE, WHICH HE DECLINED.**

In approximately mid-April 2018, Dr. Taylor expressed interest in taking a non-supervisory, advisory position at his same grade so he would no longer be under Dr. Walters's direct supervision. JA 314–15. To accommodate Dr. Taylor, Dr. Rogers created another position that would satisfy Dr. Taylor's criteria. JA 316. Dr. Taylor and Dr. Rogers discussed the position for several weeks. *Compare* JA 314 *with* JA 376. Dr. Rogers sent Dr. Taylor the position description to review. JA 377. Although it met Dr. Taylor's criteria, Dr. Taylor feared that FDA would downgrade the position and reduce his pay after he accepted it, so he declined. JA 273.

**D.    DR. TAYLOR APPLIED FOR AN OPEN SENIOR-LEVEL LEADERSHIP POSITION AT NIH, COMPETING AGAINST AN INCUMBENT WHO HAD BEEN SERVING IN THAT POSITION FOR ALMOST SEVEN YEARS. A SELECTION COMMITTEE CONSISTING OF FIVE VOTING MEMBERS CHOSE TO KEEP THE INCUMBENT IN THE ROLE.**

In June 2019, Dr. Taylor applied to be Director of the Tobacco Regulatory Science Program (TRSP) (TRSP Director) at National Institutes of Health (NIH). JA 495, 552. He met the minimum qualifications for the position and moved onto the interview stage. JA 764. A few days before the interview, Dr. Taylor's former supervisor, Dr. Holman, sent him an email advising Dr. Taylor that Dr. Holman would be on the interview panel. JA 611. The email said:

> I am not sure what information has been shared with you about the interview for the NIH TRSP Director. I am on the interview panel. I just wanted to let

you know so that it didn't throw you off when you walked into the interview
and saw me (in case they didn't tell you who is on the interview panel).
– Matt

JA 611.

Dr. Taylor took this email personally. JA 497, Ap. Br. 8, 22–23. He construed
it as a "warning," because Dr. Taylor previously made an EEO complaint about Dr.
Holman. Ap. Br. 22–23. Dr. Taylor emailed his point of contact at NIH and asked
if Dr. Holman had a conflict of interest because "Dr. Holman is senior to me and in
my organizational chain." JA 599. Dr. Taylor expressed no other concerns about
Dr. Holman, including any potential concerns about reprisal or even interpersonal
conflict. JA 599.

On July 12, 2019, Dr. Taylor participated in an interview for the TRSP
Director position. There were eight members on the interview panel, including three
nonvoting members. JA 761–62. Dr. Holman was a nonvoting member. JA 761,
1259–60. Dr. Taylor did not observe anything unusual or untoward about Dr.
Holman's behavior during the interview. JA 497–98. The panel interviewed two
other people, including the incumbent, Dr. Helen Meissner, who currently held the
same role. JA 1257–59 (noting Dr. Meissner "was recruited to serve as the first
Director, TRSP" and had been serving in that role since 2013 with an "excellent
track record"). Dr. Meissner needed to reinterview for her job because the pay plan
and appointing authority changed. JA 1517.

-8-

Dr. Meissner was the ultimate selectee.  By all accounts, Dr. Meissner "outperformed" Dr. Taylor in the interview.  JA 1511.  *See also*, JA 1509–14 (summarizing selection panel opinions about Dr. Taylor's worse interview performance).  The selection panel summarized its findings in a memo.  JA 764–66. The panel listed the candidates in order of hiring priority, starting with the candidate they felt the strongest about hiring.  JA 764, JA 1257.  Dr. Taylor was the lowest-priority candidate of the three people interviewed.  JA 766, JA 1259.  The panel took issue with Dr. Taylor's lack of senior leadership experience and deficient preparation for the interview:

> We identified concerns based on his limited leadership experience at a senior level and his lack of knowledge about NIH funding priorities and processes. These weaknesses would make the transition to NIH and to a senior leadership position a significant challenge. It was apparent that Dr. Taylor was very enthusiastic about the position, but the Search Committee also noted that he did not seem to prepare well for the interview as demonstrated, for example, by an overall lack of knowledge about how TRSP activities intersected with the FDA.

One search committee member even noted that Dr. Taylor did not seem to do even the most basic interview preparation of "read[ing] the agency's website to understand the agency's operations."  JA 1298.

In contrast, the panel highlighted Dr. Meissner's senior leadership experience and knowledge of NIH funding priorities, noting that she served in senior leadership positions since 2000 and spent nearly seven years in the same TRSP Director position for which she was interviewing.  JA 1257–58.  The search committee also

highlighted her work coordinating "trans-NIH scientific funding opportunities for grants and contracts."  JA 1258.

Dr. Taylor learned he did not get the position on September 4, 2019.  JA 496, 612.  He initiated EEO contact the next month before even learning the identity of the selectee, alleging his non-selection was due to his age and sex.  JA 497.  Unbeknownst to Dr. Taylor at the time, Dr. Meissner was approximately seven years older than he was. JA 758.

### E. THE DISTRICT COURT GRANTED SUMMARY JUDGMENT IN FAVOR OF BECERRA.

Dr. Taylor filed five formal EEO complaints throughout 2018, 2019, and 2020.  On March 17, 2021, NIH issued a decision on one of Dr. Taylor's complaints – a claim against NIH alleging only non-selection for TRSP Director.  JA 1505–22.  NIH found no discrimination or retaliation occurred.  *Id.*

Dr. Taylor then filed a 215-paragraph complaint with the district court on June 11, 2021.  JA 7–41.  The complaint spewed a litany of allegations recounting every moment Dr. Taylor felt uncomfortable or unappreciated in the workplace.  *Id.*  None of Dr. Taylor's six counts identified which facts supported which count, instead repeatedly averring that every single paragraph in the complaint supported every single count.  *See* JA 35–40 (incorporating by reference all preceding paragraphs at the start of each count).  FDA moved to dismiss, or, in the alternative, for summary judgment.  JA 51.  The motion attached nearly two thousand pages of records,

including reports of investigation, affidavits, emails, final agency decisions, and other documentary evidence. JA 2028–29.

The district court held a hearing on the motion. JA 2109. The district court observed that the "scattershot complaint" was "all over the place," presenting "a whole slew of facts that in effect, said, Judge, you sort it out." JA 2111, 2115. The district court ordered Dr. Taylor to file a bill of particulars, specifically identifying which facts supported which cause of action. JA 2107. The district court further admonished that, once Dr. Taylor filed a more "adequately pled cause of action," the district court would consider "whether there's any need for discovery beyond that." JA 2137. Dr. Taylor filed his bill of particulars and the parties briefed that document. JA 2142–214. The district court then held a second hearing on FDA's motion for summary judgment. JA 2215–16.

Approximately one month later, the district court issued a memorandum opinion granting FDA's motion. The district court first held that Dr. Taylor could not establish a *prima facie* case for discriminatory or retaliatory non-selection as a matter of law. The district court found that Dr. Taylor's subjective belief that he was more qualified for the TRSP position than Dr. Meissner failed to defeat summary judgment, especially considering Dr. Taylor's concessions regarding Dr. Meissner's qualifications. JA 2270. The district court found Dr. Taylor's claim that Dr. Holman "swung the votes of the hiring Committee against him" too speculative

-11-

to "substantiate a retaliation claim." JA 2271. The district court further found that changes to Dr. Taylor's direct reports were the result of an office-wide reorganization and that Dr. Taylor could not establish a nexus to protected class as a matter of law. JA 2271–72. The district court dispensed with Dr. Taylor's claim that losing 1.75 hours of compensatory time was discriminatory or retaliatory, citing undisputed evidence that new policy required use of a specific form to authorize compensatory time. JA 2272. Finally, the district court held that Dr. Taylor's remaining allegations were so petty and so unconnected to any protected class as to fall below the legal standard for hostile work environment. JA 2272–73.

This appeal followed. Dr. Taylor only appeals the district court's ruling regarding his nonselection claim and his retaliatory hostile work environment claim. *See* Ap. Br. 19, 24, 28. He argues he lost the TRSP Director position due to his gender, and that Dr. Holman convinced the selection panel to rank Dr. Taylor below the selectee due to retaliatory animus. Ap. Br. 19–27. He argues that his subjective beliefs about discriminatory or retaliatory intent should have been credited as reasonable inferences. Ap. Br. 19–23. Finally, he argues that his litany of everyday complaints taken cumulatively are retaliatory hostile work environment. Ap. Br. 28.

## IV.   STANDARD OF REVIEW

The Fourth Circuit reviews decisions on summary judgment *de novo*. *Evans v. Techs. Applications & Serv. Co*., 80 F.3d 954, 958 (4th Cir. 1996). In doing so,

the Fourth Circuit steps into the shoes of the district court and considers the record as a whole. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 191 (4th Cir. 2019). Summary judgment is appropriate if "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The Supreme Court has acknowledged that "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Where facts are "so one-sided that one party must prevail as a matter of law," summary judgment is appropriate. *Id.* at 252. Courts considering a motion for summary judgment have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotations omitted).

## V.    <u>SUMMARY OF ARGUMENT</u>

This case is about an unreasonable employee attempting to spin ordinary workplace tribulations into a lawsuit. The district court correctly granted summary judgment on Dr. Taylor's ADEA and Title VII claims because the extensive administrative record left no genuine dispute of material fact regarding any of Dr. Taylor's claims. His appeal fails for three reasons.

First, Dr. Taylor conflates evidence of personal dislike with evidence needed to prove discriminatory or retaliatory animus. Dr. Taylor has a long history of

treating his coworkers inappropriately and with condescension. Even if his supervisors do see him as a difficult employee, neither Title VII nor the ADEA provide relief where personal dislike is based on an unpleasant personality or non-protected conduct and not on protected class.

Second, assuming for the purposes of this appeal that Dr. Taylor's non-selection for the TRSP Director position at NIH was an adverse action, Dr. Taylor cannot establish that his nonselection occurred under circumstances giving rise to an inference of illegal animus. Dr. Taylor did not get the TRSP Director position because a selection panel of five voting members found him to be the least qualified candidate. The basis for the panel's decision is well documented. Because he does not dispute Dr. Meissner's qualifications, Dr. Taylor's quibble with the hiring priorities for the TRSP Director position does not create a genuine dispute of material fact. Dr. Taylor's attempt to establish a retaliatory basis for his non-selection fails at the threshold and on the merits. At the threshold, it is unclear whether Dr. Taylor can pursue an "interference" claim against the United States at all. Nor can Dr. Taylor show that the individual who allegedly had retaliatory animus against him made a tangible employment decision. On the merits, Dr. Taylor's speculation that Dr. Holman "swung" the votes of the selection panel out of discriminatory or retaliatory animus has no basis in the record.

Third, Dr. Taylor's retaliatory hostile work environment claim presents a list of ordinary workplace indignities – such as being interrupted while speaking – and asks the Court to find hostile work environment only because the list is long.  While hostile work environment claims consider the totality of circumstances to determine severity or pervasiveness, everyday annoyances unconnected to protected activity still do not rise to the level of consideration.  Dr. Taylor's "eggshell psyche" cannot prove objective severity.  Nor can he establish a connection between FDA's allegedly hostile acts and his protected activity because FDA's actions stemmed from either generally applicable workplace policies or legitimate business needs.

The thousands of pages of the administrative record leave no genuine dispute of material fact as to his discrimination and retaliation claims.  This Court should affirm the district court's decision.

## VI.  <u>ARGUMENT</u>

### A.    "GRINCH" IS NOT A PROTECTED CLASS.

Title VII and the ADEA actions must be based on a protected class, and neither statute shields an employee from the consequences of his unpleasant personality.  Protected status includes age, sex, and previous protected activity.  42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a).  It does not include being a "curmudgeon[]" or a "Grinch."  Ap. Br. 12, 22.  Dr. Taylor describes "disagreements with colleagues and petty grievances," but to defeat summary judgment Dr. Taylor

-15-

must show that any alleged negativity stemmed from something other than personal dislike for his difficult nature. JA 2273. Even giving Dr. Taylor the benefit of all reasonable inferences, the best he can show is that people did not like him because of his personality, not because of his protected classes or previous EEO activity.

Where an employee has unpleasant experiences in the workplace because people simply find him irritating or unpleasant to be around, he has no discrimination or retaliation claim. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) ("Even if Price harbored some personal dislike of Hawkins that made Hawkins' job more difficult or stressful, '[a]n employer is not required to like his employees.'" (quoting *Williams v. Cerberonics*, 871 F.2d 452, 457 (4th Cir. 1989))). In *Hawkins*, this Court examined a hostile work environment claim where the employee was forced to work unreasonable hours, received a bad performance rating, her supervisor "reject[ed] her input at meetings, [and] ma[de] fun of her personality type." 203 F.3d at 279–81. This Court granted summary judgment to the employer, finding that these events lacked even "a hint of racial significance" and reflect more on "the wisdom and generosity of . . . management practices." 203 F.3d at 281.

Other circuits have also held that personal dislike does not establish illegal animus. *See, e.g.*, *Skvarla v. Potter*, 109 F. App'x 799, 801 (7th Cir. 2004) ("Mere personal dislike that is unrelated to the plaintiff's age, sex, or protected activities will not support a claim of discrimination or retaliation under Title VII or the

ADEA.") (citing to *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 548 (7th Cir. 2002)); *McCollum v. Bolger,* 794 F.2d 602, 610 (11th Cir. 1986) ("Personal animosity is not the equivalent of [race] discrimination and is not proscribed by Title VII. The plaintiff cannot turn a personal feud into a sex discrimination case by accusation."); *id.* (noting the plaintiff was "a combative, hostile, rude, vindictive, and dictatorial employee"); *Sullivan v. Sch. Bd. of Pinellas Cnty.*, 773 F.2d 1182, 1185 (11th Cir. 1985) ("[A]ppellant's difficulties with her coworkers and her subsequent discharge were not on account of her sex or religion, but because she was adversarial and a difficult person with whom to work."); *id.* (noting that appellant's "difficulty in getting along with her coworkers had been noted on her performance evaluation").

Here, performance reviews, memoranda of counseling, and witness affidavits documented Dr. Taylor's difficult personality. *See* Section III.A, *supra*. Not only did multiple supervisors receive complaints from Dr. Taylor's subordinates about Dr. Taylor's condescension and rude treatment, but his supervisors also witnessed Dr. Taylor's inappropriate behavior with his coworkers. *See, e.g.*, JA 155, 159, 174, 179–80, 223; Section III.A, *supra*. Importantly, Dr. Taylor does not dispute that these incidents with his coworkers and subordinates occurred. JA 133–34, 139, 209.

Dr. Taylor's arguments on appeal conflate having a challenging personality with establishing a prima facie case for discrimination or retaliation. He asks this

Court to infer "from the Grinch statement, the performance appraisal comments and the counseling . . . that Dr. Taylor is viewed as a difficult person." Ap. Br. 22. Inferring that Dr. Taylor was "a difficult person" would not move the needle on the Court's summary judgment analysis. To survive summary judgment, Dr. Taylor must "establish a link between [a supervisor's] personal dislike of [him] and his membership in a protected class." *Darvishian v. Geren*, 404 F. App'x 822, 830 (4th Cir. 2010). Dr. Taylor cannot use his unlikeable personality to link workplace challenges to protected class and he offers no other causation evidence.

**B.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGEMENT AS TO DR. TAYLOR'S NON-SELECTION CLAIMS BECAUSE HE CANNOT SHOW CIRCUMSTANCES GIVING RISE TO AN INFERENCE OF DISCRIMINATION OR PRETEXT.**

Given the facts in the record and Dr. Taylor's own concessions, his unsuccessful attempt to unseat the incumbent TRSP Director does not amount to discriminatory or retaliatory non-selection as a matter of law. Dr. Taylor's claims require him to causally connect his non-selection to sex or retaliation.[1] *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004) (non-selection plaintiff must prove "circumstances that give rise to an inference of discrimination"); *Mod-U-Kraf*

---

[1]   The district court held that Dr. Taylor's non-selection was not an adverse action in light of the record. JA 2269–70. FDA does not address that argument on appeal, as there are sufficient grounds to affirm the district court's ruling on the causation prong.

*Homes,* 775 F.3d 202, 210 (4th Cir. 2014) (retaliation plaintiff must show protected activity was a "but-for" cause of the materially adverse action rather than simply a "motivating factor" (internal quotations omitted)).

Here, the district court correctly granted summary judgment because Dr. Taylor's non-selection does not give rise to an inference of discrimination or retaliation as a matter of law. Nor can Dr. Taylor defeat summary judgment by offering his own opinion of his qualifications. Dr. Taylor's speculation that Dr. Holman must have "swung" the selection panel against him for retaliatory reasons is not a basis to impute liability on HHS, nor is it reasonable in light of the record.

> **1.    Dr. Taylor's non-selection for TRSP Director does not give rise to an inference of discrimination or retaliation because the selection panel unanimously agreed Dr. Taylor was less qualified than the selectee.**

A committee of eight people participated in Dr. Taylor's interview for TRSP Director, and five people evaluated him using four defined categories. JA 1383–84, JA 1257–59. They all determined that the person who had been successfully serving in the TRSP Director role for nearly seven years should continue in that role. JA 1257–59. Under these circumstances, Dr. Taylor cannot establish a prima facie case of discriminatory or retaliatory non-selection.

An employer does not run afoul of Title VII by picking its method of evaluating candidates for a job, rating those candidates in different areas, weighing those areas differently, and ultimately choosing among equally qualified candidates.

*Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 259 (1981) (choosing among qualified candidates); *White v. Seventh Jud. Cir. of Md.*, 846 F.2d 75, at *1 (4th Cir. 1988) (table op.) (rating candidates using weighted criteria); *Devonish v. Napolitano*, No. 13-0108, 2014 WL 465707, at *7 (D. Md. Feb. 4, 2014) ("An employer has discretion to choose which method it will use to evaluate candidates for promotion, including use of an interview process."). Employers may consider a candidate's interview performance when making a selection decision. *Ogunwole v. Raimondo*, 616 F. Supp. 3d 478, 485 (D. Md. 2022). *See also*, *Burdine*, 450 U.S. at 1096 (noting Title VII "was not intended to diminish traditional management [hiring] perogatives" (internal quotations omitted)).

On summary judgment, an employee's belief regarding how his employer should weigh selection criteria is legally irrelevant because "an employee may not choose the criteria on which [he] wishes to compete . . . for [a] promotion." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271 (4th Cir. 2005) ("[An employee] cannot establish pretext by relying on criteria of [his] own choosing when the employer based its decision on other grounds.'"). In choosing between candidates, the Fourth Circuit has identified "[j]ob performance and relative employee qualifications . . . as valid, non-discriminatory bases for any adverse employment decision." *Techs. App.*, 80 F.3d at 960. Even where an employer weighs criteria unwisely, courts assessing employment cases must avoid basing their

decisions on the wisdom of business practices.  The Fourth Circuit has repeatedly made clear that courts should not "sit as a super-personnel department weighing the prudence of employment decisions made by the defendants." *Westinghouse*, 406 F.3d at 272 (internal quotations and citations omitted).  *See also EEOC v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992) ("It is not for this court . . . to direct the business practices of any company.").

The Tenth Circuit recently applied these concepts to a case remarkably like the instant case in which the plaintiff competed against an incumbent for a promotion.  *Bekkem v. Wilkie*, 915 F.3d 1258, 1273 (10th Cir. 2019).  There, the court held as a matter of law that "a reasonable fact-finder could not infer retaliation from the decision to keep another employee in his job rather than replace him with someone who had admittedly experienced 'interaction issues' with other employees."  *Id.* (internal quotations omitted) (ultimately finding a different retaliation claim survived pretext analysis).

Similarly here, the circumstances do not give rise to an inference of discrimination or retaliation.  First, as in *Burdine*, NIH chose to conduct an interview of all qualified candidates and established criteria by which to evaluate those interviews.  JA 1257, 1278, 1328–29.  The interview questions were standardized; each applicant received the same questions asked by the same panel members.  JA 1278, 1330.  Second, the selection panel unanimously favored Dr. Meissner over Dr.

Taylor.[2]  The selection panel specifically noted that Dr. Taylor seemed unprepared for several of the interview questions and "overall lack[ed] knowledge about how TRSP activities intersected with the FDA" and "about NIH funding priorities and processes."  JA 758.  Each voting member of the panel agreed that Dr. Taylor fell short compared to Dr. Meissner.[3]

Moreover, like *Bekkem*, Dr. Taylor lost the TRSP Director position to a successful incumbent.  Dr. Meissner had been serving prosperously in the same role for nearly seven years, in contrast to Dr. Taylor's more limited senior leadership experience.  JA at 1257–58.  Additionally, an EEO observer present during the interviews observed no "red flag[s]" suggesting illegal animus.  JA 1307.   Finally,

---

[2]    The administrative record also includes scoring sheets from each voting member along with Dr. Holman.  JA 1331–36  The scoring sheets only evaluate each candidate's resume, not interview performance.  JA 1283 ("The ratings we gave the candidates were not reflective of their interviews.").

[3]    JA 1279 ("We were concerned about [Dr. Taylor's] limited executive scientific experience and his lack of knowledge about NIH funding priorities and processes."), 1283 (recalling Dr. Taylor's "knowledge of the [TRSP] operations and funding and its relationship to FDA were inferior to that of Dr. Meissner"), 1287 (explaining Dr. Taylor "did not perform well in his interview.  His performance reflected a lack of awareness of NIH funding processes and priorities.  He had a strong background in chemistry, but not in leading a national research background in tobacco control."), 1294 ("I thought [Dr. Taylor's] knowledge of NIH funding and processes were at a lower level than other candidates. . . . [H]e did not seem well prepared for his interview or understood how the TRSP intersected with the FDA."), 1298 (noting Dr. Taylor did not appear to do even the most basic interview preparation of "read[ing] the agency's website to understand the agency's operations").

the selecting official was unaware of Taylor's previous EEO activity and thus could not have had a retaliatory motive.  JA 759–60.

Dr. Taylor argues that NIH should have weighed criteria differently, giving more weight to his enthusiasm.  Ap. Br. 25–26.  However, he cannot defeat a motion for summary judgment by arguing an employer should have weighed criteria differently.  *See Westinghouse*, 406 F.3d at 271; *Ogunwole*, 616 F. Supp. 3d at 486.  Employers are allowed to weigh criteria according to their judgment.  *Seventh Jud. Cir.*, 846 F.2d at 75 (table) (employee who received a high rating on one criterion but lower ratings on another does not establish retaliatory non-promotion).

Moreover, the record does not support Dr. Taylor's argument that "'***energy***' and '***enthusiasm***'" were "essential qualities."  Ap. Br. 25.  In fact, the search committee identified "four categories [which] were considered to be essential for the position," and none of these categories mention energy or enthusiasm.  JA 1257.  Instead, they highlighted the same "senior-level scientific experience" and ability to manage resources that Dr. Taylor lacked.  JA 1257, 1259.  The selecting official also explicitly contradicted Dr. Taylor's argument when he attested, "I was less concerned than the Search Committee about [Dr. Meissner's] vision and enthusiasm" given his long experience working with her on the TRSP.  JA 274.  The administrative judge who decided Dr. Taylor's case against NIH explained any lack of enthusiasm from Dr. Meissner by pointing to the fact that "she had to interview

-23-

for essentially the same position she had held for several years." JA 1518. *See also* JA 1517 (noting that pay plan and appointing authority for the TRSP Director position changed, presumably necessitating a new hiring search).

Dr. Taylor cherry-picks a few negative comments about Dr. Meissner to establish pretext, but the record leaves no room for a genuine dispute of fact. Even committee members who took issue with Dr. Meissner's performance still thought Dr. Taylor did worse. *Compare* JA 1293 (noting Dr. Meissner's "relatively low energy presentation") with JA 1294 (the same interviewer criticizing Dr. Taylor's interview performance, noting his "knowledge of NIH funding and processes" was the worst of all candidates); *compare* JA 1288 (expressing moderate surprise at Dr. Meissner's appointment) *with* JA 1287 (the same interviewer noting that Dr. Taylor "did not perform well in his interview" and had no "awareness of NIH funding processes and priorities").

As a result, Dr. Taylor cannot establish a prima facie case of discriminatory or retaliatory non-selection as a matter of law.

> **2.     Dr. Taylor cannot establish that the reasons justifying his non-selection were pretext as a matter of law because he concedes that Dr. Meissner was qualified and has no evidence that he was significantly better qualified.**

Even if Dr. Taylor could establish a prima facie case of discriminatory or retaliatory non-selection, the district court still correctly granted summary judgment because the record precludes any finding of pretext. Because Dr. Taylor does not

dispute Dr. Meissner's qualifications but only argues he is slightly more qualified, his non-selection claims must fail.

An employer's legitimate explanation for an adverse employment action "destroy[s]" any presumption of unlawful motivation established in a plaintiff's *prima facie* case and shifts the burden the plaintiff to show that the explanation is pretext for discrimination or retaliation. *E.E.O.C. v. Western Elec. Co., Inc.*, 713 F.2d 1011, 1014 (4th Cir. 1983). There are two "primary methods" for proving pretext in a non-selection case. *Stephens v. Gutierrez*, No. 8-cv-870, 2010 WL 1005189, at *5 (E.D. Va. Mar. 15, 2010) ("The Fourth Circuit has recognized two primary methods for demonstrating pretext in non-selection cases."). First, pretext may be inferred if the plaintiff is more qualified than the individuals selected for the job. *Giarola v. Com. Of Va. Dep't of Gen. Servs.,* 753 F.2d 1281, 1287 (4th Cir. 1985). Importantly, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Tech. Apps.*, 80 F.3d at 960–61 (internal quotations omitted). Second, courts might infer pretext if the employer lies about the reasons for plaintiff's non-selection. *Heiko v. Columbo Sav. Bank*, 434 F.3d 249, 259 (4th Cir. 2006).

A plaintiff defending against summary judgment on the issue of pretext must "demonstrate[] such weaknesses, implausibilies, or inconsistencies in [the defendant's] proffered reasons . . . that a reasonable fact-finder could find those

reasons unworthy of credence." *Darvishian*, 404 Fed. App'x at 831. Where the record contains "ample evidence" supporting an employer's legitimate explanation, falsity cannot be shown. *Ham v. Wash. Suburban Sanitary Com'n*, 158 Fed. App'x 457, 475 (4th Cir. 2005) (affirming summary judgment entered against one plaintiff). Here, Dr. Taylor cannot show pretext as a matter of law. He effectively concedes that Dr. Meissner was qualified for the TRSP Director position, and thus cannot show that the reasoning for her selection was a lie.

Dr. Taylor cannot establish falsity where he concedes the ultimate selectee was qualified for the role. The Sixth Circuit has explored how much evidence is needed when a pretext argument is based on disparate qualifications between a plaintiff and the selectee. *See Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006). It has held that, "to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Hecht's*, 455 F.3d at 627 (collecting cases). *See also*, *Ham*, 158 F. App'x at 466 (considering quantum of evidence needed to show pretext based on difference in qualifications).

The difference in qualifications needed to establish pretext based on qualifications is stark. The Fourth Circuit found pretext sufficient to survive summary judgment in a case where the selectee for a "lead tech" position "did not

possess the articulated minimum qualifications for the position," while the plaintiff had decades of experience and had performed as "Acting Lead Tech in a superior fashion." *Ham*, 158 F. App'x at 466 ("A jury could logically conclude that any reasonable employer would deem an individual who meets the stated qualifications of the job to be more qualified than one who does not."). Similarly in *Laurent-Workman*, the Fourth Circuit affirmed dismissal of a non-selection claim because the employee failed to allege that the ultimate selectee was not qualified. *Laurent-Workman v. Wormuth*, 54 F.4th 201, 213–14, 219 (4th Cir. 2022) (noting employee failed to plead a causal link between non-selection and protected class). The presence of a selection committee also matters; flouting the selection committee's recommendation can establish pretext at the summary judgment stage. *Ham*, 158 F. App'x at 466 (finding jury question on pretext where selecting official "made his decision in contravention of the entire panel's recommendation").

Here, Dr. Taylor cannot establish pretext based on a difference in qualifications as a matter of law. It is undisputed that Dr. Meissner was qualified for the TRSP Director position. The search committee unanimously found her to be qualified for the job and rated her as the top-priority hire. JA 1257–1260. The selection memo demonstrated consistent reasoning supporting Dr. Meissner's hire and showing why Dr. Taylor was less qualified. The committee noted Dr. Taylor's "limited leadership experience at a senior level and his lack of knowledge about NIH

funding priorities and processes." JA 1259. The committee also noted that Dr. Taylor "did not seem to prepare well for the interview as demonstrated, for example, but an overall lack of knowledge about how TRSP activities intersected with the FDA." JA 1259. In contrast, the committee praised Dr. Meissner for her six years of service as the TRSP's first director and highlighted her other senior scientific leadership experience. JA 1257–58. It also mentioned her "coordination of trans-NIH scientific funding opportunities for grants and contracts," validating the selection panel's prioritizing awareness of NIH funding priorities. JA 1258.

At the administrative level, Dr. Taylor "did not dispute, much less disprove," that Dr. Meissner was better qualified for the position than he. JA 1517. And even now Dr. Taylor concedes Dr. Meissner was qualified, but believes "he was better qualified." Ap. Br. 5, 9, 17, 24 (conceding "there is no dispute that Dr. Taylor and . . . Dr. Meissner were both deemed qualified"). The fact that Dr. Taylor personally believes he is more qualified to be TRSP Director than the person who successfully held the TRSP Director position for the previous six years is irrelevant. A plaintiff's "bald assertions concerning [his] own qualifications and the shortcomings of [his] co-workers fail to disprove" an employer's legitimate explanation. *Tech. Apps.*, 80 F.3d at 960 (collecting cases). Dr. Meissner indisputably served as TRSP Director with an "excellent track record" for over six years, since 2013. JA 1257–58. The search committee spent several paragraphs recounting her leadership experience,

accomplishments, and "ability to work across multiple disciplines to develop tobacco related initiatives."  JA 1258.

The only basis Dr. Taylor provides for his superior qualifications is his level of enthusiasm.  Ap. Br. 26–27.  It is true that the search committee did acknowledge Dr. Meissner's "low level of vision and enthusiasm during the interview," but the search committee included a paragraph of reservations about both other candidates as well and the selecting official had experience with Dr. Meissner's vision and enthusiasm from her previous work as TRSP Director.  JA 1258–59, 1274. Moreover, as noted above, enthusiasm was not hiring criteria.  JA 1257, 1329; Section VI.B.1, *supra*.  Any difference in enthusiasm is not material.

Dr. Taylor attempts to create a genuine dispute about discriminatory animus by pointing to gender statistics at FDA to justify his inference that gender discrimination caused his non-selection.  Ap. Br. 27 (citing to a summary of witness testimony on JA 1531–32).  This fact is not material.  While statistics can help satisfy a plaintiff's "relatively light *prima facie* burden, they lend little weight to rebut [an employer's] legitimate, non-discriminatory rationale" for a non-selection.  *Hecht's,* 455 F.3d at 628.  Dr. Taylor also suggests there is "a genuine issue of material fact as to who actually made the selection decision."  Ap. Br. 26.  There is no such dispute.  The factual record makes clear that Dr. Murray was the selecting official.  JA 1257, 1271 (attesting "I made the selection").  Dr. Taylor's attempt to draw a

distinction between whether the committee "recommended" Dr. Meissner or just ranked Dr. Meissner at the top of a list of candidates is semantics. Ap. Br. 26.

The district court correctly granted summary judgment on Dr. Taylor's non-selection claims because Dr. Taylor cannot prove pretext as a matter of law.

### 3. The "disputed" facts surrounding Dr. Holman's alleged retaliatory interference with Dr. Taylor's application for TRSP Director are neither genuine nor material.

Dr. Taylor attempts to link retaliation and non-selection by assuming his former supervisor Dr. Holman advocated for his non-selection with retaliatory intent. Ap. Br. 20–23. While Dr. Taylor invents factual disputes around these issues, the disputes he creates are neither genuine nor material and cannot defeat summary judgment. At the threshold, it is unclear whether a claim for Title VII "interference" is allowed against the federal government. Moreover, Dr. Holman had no power to take a tangible employment action against Dr. Taylor. On the merits, Dr. Taylor's belief that Dr. Holman must have swung the entire interview panel against Dr. Taylor for retaliatory reasons is speculative and is not genuine.

### a. The Fourth Circuit has not held that Title VII allows interference claims against the federal government.

Dr. Taylor advances a "retaliatory interference in non-selection" claim, but the Fourth Circuit has never held that the United States can be liable for Title VII interference. *Compare* Ap. Br. 19 *with Eghbali v. Dept. of Energy at Savannah River Nat. Lab.*, 90 F. Supp. 3d 587, 596 (D.S.C. 2015) (citing *Bender v. Suburban*

*Hosp.*, 159 F.3d 186, 187 (4th Cir. 1998)) (noting in *Suburban Hospital* the Fourth Circuit "was careful not to expressly hold that Title VII provides for an interference claim"). Rather, in *Suburban Hospital*, the Court "assume[d], without deciding" that such a claim existed. 159 F.3d at 188 (citing to two circuit court decisions existing at the time which both allowed such a claim). *See also Suburban Hosp.*, 159 F.3d at 188 ("We also need not resolve for the first time in this Circuit whether Title VII allows indirect liability for an employer's interference with an individual's employment with third parties.").

More recent precedent suggests such a claim is not viable. In 2014, Judge Nickerson weighed *Suburban Hospital* against more recent cases on Title VII interference and declined to allow a Title VII interference case to go forward. *Nhira v. Bowie State Univ.*, No. 14-cv-676, 2014 WL 6065998, at *3–4 (D. Md. Nov. 12, 2014). Judge Nickerson noted that, while a few circuits "initially adopted" an interference claim, courts later "backed away from this expansion of potential 'employers' under Title VII." *Nhira*, 2014 WL 6065998, at *3 (citing *Lopez v. Massachusetts*, 588 F.3d 69, 83–98 (1st Cir. 2009) (finding "interference theory is entirely inconsistent with the use of the common law criteria the Supreme Court has identified" in defining the meaning of a Title VII "employer"); *Gulino v. N.Y. State Educ. Dept.*, 460 F.3d 361, 373–75 (2d Cir. 2006)).

-31-

Nor is there any statutory basis to infer a cause of action for "interfering with someone's employment relationship with a third party" against the federal government. *Eghbali*, 90 F. Supp. 3d at 596. As the District of South Carolina noted, even if a claim of interference did exist, it likely would not apply to the federal government since the claim would arise from Title VII's prohibited employer practices provision, and Title VII "expressly excludes the federal government from its definition of employer." *Eghbali*, 90 F. Supp. 3d at 597 (citing 42 U.S.C. § 2000e(b) ("The term 'employer' . . . does not include . . . the United States.")). *See also id.* ("[T]he basis for an interference claim is 42 U.S.C. § 2000e-2(a), which does not apply to the federal government. *See* 42 U.S.C. § 2000e(b).").

Dr. Taylor cites to no cases in support of his argument that Title VII allows an interference claim. The Court should not allow such a claim here.

> **b.    Dr. Holman did not have the power to make a tangible employment decision as a matter of law.**

Dr. Taylor's retaliatory non-selection claim further fails at the threshold because the decisionmaker was unaware of his protected activity so had no possible retaliatory animus. JA 759–60. Because Dr. Holman is the only person Dr. Taylor alleges had a retaliatory motive, and because Dr. Holman had no tangible power to make a hiring decision for the TRSP Director position, the district court correctly granted summary judgment.

An employer can only be liable for a non-selection if it resulted from an "act[] of its employees holding supervisory or other actual power to make tangible employment decisions." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 287 (4th Cir. 2004) (overruled on other grounds related to mixed motive) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998)). A discriminatory or retaliatory motive that "lead[s] to or influence[s] a tangible employment action" is not actionable unless the person with the illegal motive held "actual power to make [a] tangible employment decision[]." *Hill*, 354 F.3d at 287. *See also*, *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (holding "an employee is a 'supervisor' . . . if he or she is empowered by the employer to take tangible employment actions against the victim"); *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 602 (D. Md. 2018) ("[A] supervisor's discriminatory animus may support liability only if the supervisor was, in effect, 'principally responsible for, or the actual decisionmaker behind, the action.'" (quoting *Hill*, 354 F.3d at 291)).

Dr. Holman did not have the power to hire the NIH TRSP Director. The record demonstrates that Dr. Holman, who worked for FDA, was one of eight people in the interview room and he had no right to vote on any candidate's hire. JA 702, 761–62. Influencing someone else's employment action does not generate liability, and even if it did, there's no evidence in the record that Dr. Holman exercised such influence. *Hill*, 354 F.3d at 287. Dr. Holman chimed in with comments on

applicants "after every other panelist shared their input."  JA 702.  By the time he

commented, he had no "new information [to add] that wasn't already provided by

the other panelists."  JA 702.  Ultimately, "the panelists were unanimous that the

incumbent was the top ranked applicant," agreeing that she "had been successfully

serving in the position for years."  JA 703.  The actual decisionmaker, Dr. Murray,

was unaware of Dr. Taylor's previous protected activity.  JA 759-60, 1257, 1271.

Dr. Taylor cannot show that anyone with retaliatory intent had the power to

hire the TRSP Director, so his non-selection claim fails as a matter of law.

> **c.** **Dr. Taylor's speculative belief that Dr. Holman swung the interview panel against him is not genuine.**

Moreover, Dr. Taylor cannot create a genuine dispute of fact using speculation

that Dr. Holman advocated against Dr. Taylor because of retaliatory animus.  Ap.

Br. 20.  In the employment discrimination context, "a subjective belief of

discrimination, however genuine, cannot be the basis of judicial relief."  *Moore v.

Reese*, 817 F. Supp. 1290, 1295 (D. Md. 1993) (citations omitted).  Dr. Taylor's

speculations about Dr. Holman's retaliatory motive "are insufficient to counter

substantial evidence of legitimate nondiscriminatory reasons for an adverse action."

*Cerberonics*, 871 F.2d at 456 (upholding judgment notwithstanding verdict on Title

VII claims).  Where evidence supporting the nonmoving party's conclusion is

"overly speculative in light of the record," summary judgment is still appropriate.

*Dash v. Mayweather*, 731 F.3d 303, 317 (4th Cir. 2013).  Here, Dr. Taylor's

insistence on a retaliatory conspiracy to rob him of the TRSP Director position is "overly speculative in light of the record" for two reasons. *Dash*, 731 F.3d at 317.

First, the selection panel made no reference Dr. Taylor engaging in protected activity or even having non-protected conflicts with others. JA 758. Instead, the selection panel's memo observed that Dr. Taylor was ill-prepared for the interview and lacked the senior leadership experience that was vital to the TRSP Director position. JA 1259. *See also* Sections VI.B.1–2, *supra*.

Second, Dr. Taylor's argument that he can survive summary judgment merely by showing that Dr. Holman had "a subtle lack of enthusiasm" or "fail[ed] to advocate on Dr. Taylor's behalf" is not genuine considering the case law and the record. Ap. Br. 23. Where non-selection occurs due to friendship, politics, or interpersonal conflict, courts do not infer illegal animus. *See Fabunmi v. Univ. of Md. at Coll. Park*, 172 F.3d 862, at *2 (4th Cir. 1999) (table op.); *Autry v. N. Carolina Dep't of Hum. Res.*, 820 F.2d 1384, 1385 (4th Cir. 1987). Moreover, a subtle influence does not rise to the level of tangible employment action. *See* Section VI.B.3.b, *supra*. If Dr. Taylor had his way, he could show discriminatory or retaliatory motive with anything short of Dr. Holman pounding his fists on a table and loudly demanding that Dr. Taylor receive the TRSP position. The law does not hold employers to such an absurd standard. *See* Section VI.B.3.b, *supra*. Dr. Holman is permitted to believe Dr. Taylor is not the best candidate for a position, as

long as that belief is not based on his previous protected activity.  And here, the evidence in the record shows that Dr. Holman agreed with the rest of the selection panel that Dr. Meissner was the best candidate for the job Dr. Meissner already held. JA 703, JA 1257–59.

Dr. Taylor suggests that Dr. Holman relied on his personal experience with Dr. Taylor while participating in the interview process.  Ap. Br. 21–22.  Even if that is true, and even if Dr. Holman viewed his personal experience with Dr. Taylor to be negative, the relationship between Dr. Taylor and Dr. Holman does not create a genuine dispute of material fact on a retaliation claim.  The law allows employers to consider their dislike for an employee's "abrasive style" or "style of management" in denying an employee a position.  *Ham*, 158 F. App'x at 474–75.  *See also*, *Verniero v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388, 391–92 (10th Cir. 1983) (holding subjective assessment that a plaintiff might have difficulty "get[ting along with people" was a valid basis supporting non-selection).

Dr. Taylor also argues that an instance in which Dr. Holman referred to Dr. Taylor as the "Grinch" shows Dr. Holman harbored retaliatory animus against Dr. Taylor that he must have brought into the interview room.  Ap. Br. 12, 22.  Even a generous reading of the record does not support this explanation.  The Seventh Circuit held that use of a pejorative that "does not necessarily connote some specific . . . characteristic of protected class" does not transform personal dislike into

-36-

evidence of dislike based on protected class. *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1167–68 (7th Cir. 1996) (holding the word "bitch" is sufficiently unconnected to the specific characteristics of a woman so as not to show gender-based animus), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Here, even Dr. Taylor admits that a "Grinch" refers to someone who is "hairy, pot-bellied, pear-shaped, snub-nosed . . . with a cat-like face and known for his cynical personality." JA 751. None of these characteristics relate to any of Dr. Taylor's protected classes. Moreover, Dr. Taylor's brief is silent about the context surrounding the "Grinch" statement. Dr. Holman made this comment on December 19, 2019, six days before Christmas. Ap. Br. 12. Dr. Holman was touring festive holiday-themed decorations on Dr. Taylor's floor. JA 698, 748. The hallway outside Dr. Taylor's office was covered in Grinch-themed decorations. JA 698. Dr. Taylor even concedes that Grinch decorations surrounded him. JA 667. In other words, Dr. Holman referred to Dr. Taylor as "the Grinch" as Dr. Taylor walked through Grinch-themed holiday decorations in front of his own office. Dr. Holman's actions following the comment further show his non-retaliatory meaning. Dr. Holman personally apologized to Dr. Taylor and explained the intention behind the remark. JA 749, 753–54. Considering these surrounding facts, there is no genuine dispute that Dr. Holman's "Grinch" comment did not relate to Dr. Taylor's protected

activity or show retaliatory intent, nor can it establish pretext to support Dr. Taylor's non-selection claim.

At the core of Dr. Taylor's non-selection claims is the bald assertion that Dr. Holman, who served on the selection committee for a different agency as a nonvoting advisory member, must have secretly convinced the five voting members to tank Dr. Taylor's chances due to his previous protected activity and then cover it up by unanimously agreeing on a different explanation for Dr. Taylor's non-selection. This speculation cannot survive review of the entire record. The district court properly granted summary judgment.

### C. DR. TAYLOR'S RETALIATORY HOSTILE WORK ENVIRONMENT CLAIM CONSISTS OF INNOCENT OR TRIFLING ANNOYANCES THAT, EVEN COLLECTIVELY, ARE NEITHER SEVERE NOR PERVASIVE.

The district court rightfully dispatched Dr. Taylor's long list of petty gripes about his workplace. A *prima facie* case of hostile work environment harassment requires a showing that "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). The Supreme Court cautioned that these standards are "sufficiently demanding to ensure that Title VII does not become a general civility code," and should "filter out complaints attacking the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (internal quotations omitted). "[C]omplaints premised on nothing more than

rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (internal quotations and citations removed) (cleaned up).

Dr. Taylor appeals only the district court's determination regarding his allegations of hostile work environment based on previous protected activity. Ap. Br. 28. He takes issue with the district court's determination that his alleged hostile work environment "fell short of the 'severe and pervasive' standard," arguing that the district court "divid[ed] the whole and minimize[ed] the resulting parts." Ap. Br. 28. He insists that "the actions and comments he endured were serious . . . . purposeful jabs and actions that resulted in Dr. Taylor seeing his stature in the workplace diminish and his role becoming more confined and less important." Ap. Br. 28.

Dr. Taylor's argument fails. A list of petty, everyday grievances unconnected to protected activity cannot establish retaliatory hostile work environment even if that list is very long. The district court correctly granted summary judgment on Dr. Taylor's hostile work environment claims for three reasons. First, Dr. Taylor is not a reasonable employee and his subjectively hurt feelings do not establish objective severity. Second, Dr. Taylor cannot show that any allegedly hostile actions connect to his protected activity as a matter of law. Finally, a number of Dr. Taylor's

complaints cannot form the basis of a hostile work environment analysis because they are quintessentially the everyday annoyances of having a job.

> **1.    Dr. Taylor's objectively unreasonable perception of his workplace is not a sufficient basis to defeat summary judgment.**

An employee's subjective feelings of being harassed are not enough to show hostile work environment, and this is especially true when the employee has a psyche made of an eggshell.  The Fourth Circuit requires hostile work environment plaintiffs opposing summary judgment "'to identify situations that a reasonable jury might find to be so out of the ordinary' that it qualifies as severe or pervasive." *Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 414 (4th Cir. 2022) (quoting *Sunbelt Rentals,* 521 F.3d at 315–16.  In assessing severity or pervasiveness, both the Supreme Court and the Fourth Circuit require Dr. Taylor to "meet both [a] subjective and objective prong."  *Webster*, 38 F.4th at 414.  *See also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).  To satisfy this two-part test of severity and pervasiveness, Dr. Taylor must first show that he himself felt the behavior was severe or pervasive.  Concededly, he has done that.  Second, he must "demonstrate that . . . 'a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive."  *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998).  On that second objective element, Dr. Taylor fails.

The Supreme Court places conduct "beyond Title VII's purview" unless a "reasonable person" would find the conduct "hostile or abusive." *Harris*, 510 U.S. 17, 21–22. The reasonable person standard "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006) ("We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective.").

Courts in other jurisdictions have applied the Supreme Court's rule to the concept of an easily triggered plaintiff, holding that the objective prong of the Court's severity and pervasiveness test does not protect the feelings of a "supersensitive 'eggshell' plaintiff." *Daniels v. Essex Grp., Inc.*, 937 F.2d 1264, 1271 (7th Cir. 1991) (explaining that "the objective standard places a check on claims for relief" from unreasonably sensitive plaintiffs). *See also Petro-Ryder v. Capt. Jacqueline Pittman*, No. CV 15-2908, 2015 WL 8731623, at *14 (E.D. Pa. Dec. 11, 2015) ("Discourtesy and rudeness that may bother an individual with an eggshell psyche, does not violate Title VII.").

Indeed, the Supreme Court's objective standard is purposefully designed to "prevent eggshell plaintiffs – those offended by comments or actions that would not offend a reasonable person – from recovering under Title VII." *E.E.O.C. v. Int'l Profit Assocs., Inc.*, No. 01-C-4427, 2007 WL 3120069, at *13 (N.D. Ill. Oct. 23,

2007) (citing *Oncale*, 523 U.S. at 81). *See also*, *Duplessis v. Training & Dev. Corp.*, 835 F. Supp. 671, 678 (D. Me. 1993) ("[T]he evidence clearly established that Plaintiff is not a reasonable Franco-American, but, rather, one with an eggshell psyche." (internal quotations omitted)); *id.* (holding that plaintiff who took comments about frogs and "french kissing" as being attacks on his French identity was objectively unreasonable).

Dr. Taylor has an eggshell psyche. The record is replete with examples of his unreasonable mindset and leaves no room for a genuine dispute of fact on the objective prong of the severity and pervasiveness analysis. The following are just a few examples of Dr. Taylor's unreasonable reaction to events:

- Dr. Taylor attended a meeting with Dr. Walters and feared Dr. Walters was recording the meeting based only on the fact that Dr. Walters kept his cell phone on his desk. JA 135.

- Dr. Taylor requested that Dr. Walters hire three people for Dr. Taylor's branch. For one of those people, Dr. Taylor noted he was on the fence and wanted Dr. Walters to circle back with him, but would still be interested if she was "not picked up by someone else." JA 613. Dr. Walters selected all three people, acknowledging Dr. Taylor's hesitation. JA 624. Dr. Taylor took this as "Dr. Walters ignoring my feedback and prioritizing the feedback of others," despite the fact that Dr. Taylor specifically requested that all three individuals be hired and Dr. Walters specifically acknowledged Dr. Taylor's feedback. JA 624.

- Dr. Holman sent Dr. Taylor an email four days before his interview for TRSP Director advising Dr. Taylor that Dr. Holman would be on the interview panel. JA 611. Dr. Holman's stated purpose was "to let you know so that it didn't throw you off when you walked into the interview and saw me." *Id.* Taylor argues that this email "floored" him. Ap. Br. 8. The email has an objectively neutral if not friendly tone. JA 611.

-42-

Dr. Taylor's suggestion that the email was threatening is not genuine and especially unreasonable in light of his reaction to the possibility that an unknown person would join his PMAP review. *Compare* JA 122 (expressing fear that an unexpected person might join a PMAP-related meeting) *with* JA 611 (trying to neutralize any fear or surprise Dr. Taylor might feel at an unexpected person being present during his interview).

- While talking to a coworker, Dr. Taylor thought she "held back laughing whenever she spoke to me," which he took to indicate "there is some private joke about me." JA 432.

These are only a few examples from a voluminous record showing that Dr. Taylor is not a reasonable employee. The Court should disregard his own assertions of severity in considering whether employment actions were objectively severe.

Dr. Taylor relies on *Laurent-Workman v. Wormuth* for his argument that he can cobble together a multitude of unreasonable reactions to normal events and establish severe or pervasive harassment. Ap. Br. 30–31. *Laurent-Workman* does not go this far. Instead, it reinforces that employees must still show "material adversity" and that "[w]e must assess a retaliation claim against the perspective of a reasonable employee to avoid 'the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.'" *Laurent-Workman*, 54 F.4th at 213–14, 216 (quoting *Burlington Northern*, 548 U.S. at 68–69). While Dr. Taylor may have believed he experienced severe or pervasive harassment, Title VII does not protect his "unusual subjective feelings" or "eggshell psyche" from the everyday slings and arrows of the workplace.

-43-

### 2. Even if Dr. Taylor could establish severity or pervasiveness, he cannot show a connection to protected activity.

Dr. Taylor cannot establish that any allegedly hostile acts connected to his protected activity. Ap. Br. 28 (appealing only the district court's decision regarding "retaliatory based hostile work environment"). A hostile work environment plaintiff must show that his harassment was based on protected status. *Causey*, 162 F.3d at 801. The record here leaves no genuine dispute on this requirement. In some instances, Dr. Taylor complains about generally applicable policies or actions. In others, FDA has nondiscriminatory and nonretaliatory explanations for its actions that Dr. Taylor cannot dispute.

### a. Generally applicable workplace policies cannot form the basis of a hostile work environment complaint.

Complaints about "generally applicable workplace policies" fail to defeat a motion for summary judgment. *Carr v. N.Y. City Trans. Auth.*, 76 F.4th 172, 180–81 (2d Cir. 2023) (discussing and applying *Laurent-Workman*). The Fourth Circuit rejected a retaliation claim on pretext grounds where the employer "took the same [reassignment] action for multiple employees." *Walton v. Harker*, 33 F.4th 165, 178 (4th Cir. 2022). The Second Circuit, applying *Laurent-Workman* to a non-selection and retaliatory hostile work environment case held that complaints about broader policies, "even when taken in the aggregate, would not dissuade a reasonable employee from lodging a complaint and therefore, they were not materially

adverse." *Carr*, 76 F.4th at 180–81.  This is because "a reasonable employee would not be dissuaded from taking protected action simply because they are subject to the same policies as other employees." *Id.* at 180.

Here, Dr. Taylor complains of a number of acts that resulted from such generally applicable policies:

**Direct reports reduction.**  FDA planned to reduce Dr. Taylor's number of direct reports. *See, e.g.*, Ap. Br. 32.  The record leaves no room for a genuine dispute on this fact:  this reorganization occurred as part of an officewide reorganization.  JA 1604.  Also, as the district court observed, this reorganization would create more jobs that fell under Taylor's supervisory chain.  JA 2271.

**TPL duties.**  Dr. Colleen Rogers asked Dr. Taylor to complete Technical Project Lead (TPL) duties, which presumably are undesirable.  JA 265.  Taylor claimed these tasks were "not [assigned] to the female engineering branch chiefs."  JA 265.  This is not a genuine dispute based on the facts in the record.  Dr. Rogers rotated the assignment bundles "evenly among the branch chiefs."  JA 310.    JA 310, 318–19.  The full list of TPL assignments is located at JA 386 and further disproves Dr. Taylor's claim.   The list shows numerous female colleagues who received TPL assignments.  JA 386–95.  As just one example, Dr. Taylor was listed as TPL on eight bundles.  JA 386–95.  A female coworker, Dr. Jeong-Im, was listed as the TPL on twenty.  *Id.*

-45-

*Assignment deadlines.* Dr. Taylor received "assignments with deadlines that were not feasible." Ap. Br. 32. These deadlines related to reviewing resumes and recommending candidates for hire into Dr. Taylor's branch. JA 504, 613. Dr. Taylor was not the only person to receive this allegedly unreasonable deadline; all of the other branch chiefs, including women, got the same deadline. JA 613–14, 652. Dr. Walters explained that "at the time this was our hiring approach" and that all other branch chiefs had the same deadline and short turnaround time. JA 721.

*Compensatory time.* FDA denied Dr. Taylor 1.75 hours of compensatory time, instead awarding Dr. Taylor "compensatory time for travel." Ap. Br. 32; JA 789. Dr. Taylor did not receive regular compensatory time because of a new policy requiring employees to submit a preapproval form to authorize compensatory time. JA 506, JA 793. While Dr. Taylor takes issue with the fact that "[n]o one ever explained any requirements" to him, he does not dispute that the policy existed or argue that others outside his protected class were not subject to the policy. JA 507–08 (identifying people who received compensatory time, but failing to identify facts showing that those individuals did not comply with the generally applicable policy).

*PMAP commenting.* Dr. Taylor alleges several irregularities with his performance review, including that it did not consider some of his accomplishments and that some of his comments on the PMAP were deleted. Ap. Br. 4–5. This is consistent with broadly applicable policies regarding scope of the review period. JA

182.  It is also consistent with common practice that rebuttal material goes in a separate document instead of as comments on the PMAP itself.  JA 174.

Because these actions or policies applied generally and not just to Dr. Taylor, none of these acts can factor into a hostile work environment analysis.

### b.  Dr. Taylor cannot dispute FDA's nondiscriminatory and nonretaliatory reasons for its actions.

For Dr. Taylor's other hostile work environment grievances, even if the Court found FDA's acts were severe individually or in the aggregate, because FDA had a legitimate and truthful explanation for its actions, Dr. Taylor cannot establish a connection to retaliation as a matter of law.   Simple disagreement with a management decision is "not actionable under Title VII."  *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 601 (D. Md. 2011), *aff'd*, 465 F. App'x 274 (4th Cir. 2012).  Dr. Taylor cannot create a genuine dispute of material fact around the following allegations, because he cannot dispute FDA's legitimate explanation for its actions:

*2017 PMAP score.*  Dr. Taylor's 2017 PMAP fairly reflected his documented, years-long struggles working respectfully with his subordinates.  *See* Section III.A, *supra*.  Dr. Taylor did not dispute the truth of the criticisms regarding his working relationships but argued that his interpersonal conduct should not count against him on a PMAP.  JA 139, 209.  This dispute is not genuine.  Dr. Taylor's supervisors pointed to performance elements relating to "fostering a collaborative work environment," "fair treatment of all employees," "ensur[ing] effective team

management," and "support[ing] . . . employee work life quality." JA 174, 180, 189, 197, 206. Dr. Taylor himself conceded that, "[a]s a supervisor, I have to work effectively with others." JA 125. Indeed, Dr. Walters gave Dr. Taylor the highest marks on PMAP elements related to technical knowledge but marked him down on elements related to supervisory responsibilities and having good relationships with staff. JA 156. Moreover, Dr. Taylor's 2017 PMAP rating of 4.33 was in line with that of previous years. JA 180 (reporting previous PMAP ratings as follows: 3.83 in 2012; 4.5 in 2013; 4.33 in 2014; 4.17 in 2015; 4.5 in 2016)

*2018 Memorandum of Counseling.* Dr. Taylor's receipt of a memorandum of counseling in June 2018 followed a cluster of reports about Dr. Taylor's inappropriate workplace behavior. JA 223. *See also* Section III.A, *supra*. Dr. Walters issued the letter in consultation with FDA's human resources staff. JA 166. The letter addressed Dr. Taylor's "harassing staff members resulting in an unpleasant working environment." JA 167. Dr. Walters noted that Dr. Taylor's "behavior has been reoccurring" despite frequent efforts to address it more formally. JA 167. Dr. Walters included only "the most recent situations" in his memo. JA 168. Dr. Walters did not file the memo in Dr. Taylor's electronic personnel file. JA 166. Dr. Taylor did not deny that these incidents occurred but either justified his actions or disagreed that his tone was condescending. JA 133–34.

***Exclusion from meetings.***  Dr. Walters explained instances in which he may have excluded Dr. Taylor from a meeting.  In some of these meetings, Dr. Taylor's staff wanted to complain about Dr. Taylor's behavior.  JA 157.  Dr. Walters kept these meetings private to protect staff identity.  JA 157.  Additionally, Dr. Walters conducted meetings without Dr. Taylor while Dr. Taylor was away from the office on a detail.  JA 180.  Dr. Taylor's absence from the job is a non-pretextual reason for his absence at these meetings.

***Participation in 2017 staff performance reviews.***  Dr. Holman agreed that Dr. Taylor did not participate in 2017 performance reviews, written in January and February of 2018.  JA 158.  He noted that Dr. Taylor was away on detail and failed to provide necessary materials to evaluate his staff.  JA 158.  As a result, Dr, Walters completed evaluations without Dr. Taylor's input.  JA 158.

***Scientific contributions.***  Dr. Taylor did not receive credit as a poster contributor because the poster was not a scientific poster, but rather a basic informational poster.  JA 628.  Moreover, Dr. Taylor's contributions were not substantive, but were more in the vein of a proofreader "to a nearly complete document [that] would not generally qualify as a co-author."  JA 783.

***Voluntary reassignment.***  Dr. Rogers offered Dr. Taylor a voluntary reassignment in or around May of 2018 based on conversations with Dr. Taylor in which he requested a reassignment.  JA 314–15.  She worked collaboratively with

-49-

Dr. Taylor to craft a position that could meet his needs. JA 314, 376. Dr. Taylor does not deny this. JA 296, 306. While Dr. Rogers did ask whether the reassignment would resolve Dr. Taylor's EEO complaint, she explained that she was asking an informational question rather than conditioning the reassignment on resolution of Dr. Taylor's EEO complaint. JA 316–17. This is consistent with how FDA attempted to resolve other EEO complaints; for example, when one of Dr. Taylor's subordinates complained about Dr. Taylor's harassment, Dr. Walters resolved the complaint by transferring the complaining employee away from Dr. Taylor. JA 169.

***Unnecessary work.*** Dr. Taylor's claim of being harassed with unnecessary work stems from a June 5, 2018 email from Dr. Walters. JA 131. Dr. Taylor deviated from policy regarding discipline assignments and Dr. Walters wanted Dr. Taylor to document that deviation, either in a memo or by email. JA 131, 164–65, 219–222. Dr. Taylor agreed he deviated from policy but did not think this work was necessary. JA 131–32. Dr. Walters explained that some documentation was needed to show "why the process followed by [Dr. Taylor] deviated from the current process." JA 164.

These actions amount to justifiable employment actions based on conduct and performance. Based on the factual record as described above and as included in the Joint Appendix, Dr. Taylor cannot show that these explanations are false, nor can he show that retaliation was the real reason behind the employment actions.

### 3. Dr. Taylor's remaining allegations are petty tribulations of an ordinary workplace.

Although retaliatory hostile work environment claims might include some actions that do not change the terms and conditions of employment, acts still must be "materially adverse" and "significant." *Israelitt v. Enter. Servs. LLC*, 778 F.4th 647, 656 n.9 (4th Cir. 2023) (clarifying holding of *Laurent-Workman*).  The year after deciding *Laurent-Workman*, the Fourth Circuit clarified that *Laurent-Workman* still "acknowledges the significance requirement." *Id.* (citing *Laurent-Workman*, 54 F.4th at 213 (holding "materially adverse" standard is a "guardrail[] . . . . separat[ing] minor harms from those that threaten to chill employees from opposing unlawful discrimination").  Because the remainder of Dr. Taylor's gripes about his workplace amount to petty annoyances or personality-based conflicts, they cannot defeat FDA's motion for summary judgment.

Yelling, personal insults unconnected to protected class, giving unrealistic assignments, criticism of work performance, rejecting input at meetings, and using a "critical and condescending tone" are everyday workplace indignities that do not establish hostile work environment. *See, e.g.*, *Racklin v. Zeta Glob. Corp.*, No. 22-2077, 2023 WL 5165281, at *7 (4th Cir. Aug. 11, 2023) ("critical and condescending tone"); *Ofoche v. Apogee Med. Grp., Va., P.C.*, 815 Fed. App'x 690, 693 (4th Cir. 2020) (heavy workload and criticism of work performance); *Hawkins*, 203 F.3d at 280–81 (holding criticism, rejecting input, and making fun of employee's

personality type are the "sorts of disagreements and misunderstandings are ordinary occurrences in a workplace setting" and "declin[ing] to impute a racial character to them based simply on [employee's] conjecture."); *Rodriguez v. Kantor,* 162 F.3d 1155, at \*7 (4th Cir. 1998) (table op.) (affirming the district court's conclusion that a supervisor's giving of unrealistic assignments, isolating of the plaintiff from colleagues, "constant criticism, conflicting instructions and frequent shouting and screaming" was not severe and pervasive harassment).

The remainder of Dr. Taylor's complaints fall into this petty category. *See* Ap. Br. 31–33 (listing hostile work environment actions, including "belittling," "ignoring his emails," "giving him assignments with deadlines that were not feasible," "exaggerating minor workplace incidents," "interrupting him," and "suggesting he use the Employee assistance program"). The fact that Dr. Taylor points more than one petty annoyance changes nothing. Even a large quantity of noncognizable acts still add up to a bunch of noncognizable acts. *Laurent-Workman*, 54 F.4th at 217 (noting that a retaliatory hostile work environment analysis still should not "accept[] 'any conduct that is merely offensive'") (quoting *Harris*, 510 U.S. at 21–22). There can be no relief for these typical workplace annoyances, even considered in the aggregate.

## VII.  **CONCLUSION**

Dr. Taylor unreasonably treated every petty workplace slight and annoyance as a personal attack because of his age, gender, and previous protected activity.  But the nefarious explanations that tumble around inside Dr. Taylor's eggshell psyche find no support in the extensive factual record and are insufficient to defeat FDA's motion for summary judgment.   The district court correctly granted summary judgment and this Court should affirm the district court's decision.

Respectfully submitted,

EREK L. BARRON
United States Attorney

s/ Molissa H. Farber
Assistant United States Attorney
U.S. Attorney's Office
36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201
(410) 209-4862

*Counsel for Defendant-Appellee*

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No.    Caption:  Taylor v. Becerra, No. 23-2298**

### CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

      X    this brief contains 12,903 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), *or*

      ☐    this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      X    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14 pt., *or*

      ☐    This brief has been prepared in monospace typeface using _____ with _____.

Dated:  May 10, 2024                    s/  Molissa H. Farber_____
                                    Molissa H. Farber
                                    Assistant United States Attorney

                                    *Counsel for Defendant-Appellee*